# 25-2044

## United States Court of Appeals
### *for the*
### Second Circuit

Jose Alba,

*Plaintiff-Appellant,*

v.

City of New York, Detective William Garcia, Alvin Bragg, New York County District Attorney (DANY), Louis Molina, Former Department of Correction Commissioner, Detective Carlos Pagan, Detective John Doe, Police Officer Anthony Lall, Officer Malvin Rodriguez, Lieutenant Chandradeo Etwaroo, Sergeant Ruppert Mark, DOC Employees John Does 1-10, DOC Employees Jane Does 1-10, Police Officers John Does 1-10, Police Officers Jane Does 1-10, DANY employees John Does 1-10, DANY employees Jane Does 1-10,

*Defendants-Appellees.*

On appeal from a Judgment of the United States District Court,
Southern District of New York

# Brief of Plaintiff-Appellant

| | |
|---|---|
| Stephen Bergstein<br>Bergstein & Ullrich<br>5 Paradies Lane<br>New Paltz, N.Y. 12561<br>(845) 469-1277<br>*Counsel for Plaintiff-Appellant* | Richard Cardinale<br>26 Court Street<br>Suite 1504<br>Brooklyn, NY 11242<br>(718) 624-9391<br>*Counsel for Plaintiff-Appellant* |

**Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2. The Attack . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Point I:   Plaintiff Plausibly Alleges Claims of False Arrest and
Malicious Prosecution under Federal, State and City Law . . . . . . . . . . 31

    A.  Penal Law § 35.20(3) (Deadly Force to Prevent or
Terminate a Burglary). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    B.  Penal Law § 35.15(2) (Deadly Force in Defense of Person) . . . . . . . . . 35

    C.  Plaintiff's Pleadings Plausibly Alleged False Arrest
and Malicious Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Point II:  Plaintiff Plausibly Alleges Claims for Denial of a Fair
Trial and Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Point III: Bragg Is Not Absolutely Immune. . . . . . . . . . . . . . . . . . . . . . . . 52

    A. Bragg Did Not Establish he was Absolutely Immune. . . . . . . . . . . . . . 52

    B. Bragg was Still Investigating when he Prosecuted Plaintiff . . . . . . . . . 57

    C. Bragg was Acting as an Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    D. Plaintiff was Prosecuted before Bragg Acquired Probable Cause . . . . . 61

    E. Bragg was Engaged in Personal Acts when he Prosecuted Plaintiff. . . . 62

    F. Bragg Acted Without Authority and/or Intertwined his Exercise
       of Authorized Prosecutorial Discretion with Unauthorized Conduct. . . 63

Point IV: The NYPD Defendants Are Not Entitled to Qualified Immunity . . . . . 64

Point V:  Plaintiff Has Plausibly Alleged Failure to Intervene Claims
        Against All Defendants and There Was No Improper Group
        Pleading in Plaintiff's Pleadings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Point VI: The City, Commissioner Molina and Unidentified Defendants
        Are Liable for the Unconstutional Conditions of Confinement and
        Inadequate Medical Care Plaintiff Experienced at Rikers Island . . . . . 69

Point VII: Plaintiff's State Law Claims Should Be Reinstated . . . . . . . . . . . . . . . 74

Point VIII: The Denial of Discovery Deprived Plaintiff of
        His Substantial Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## Table of Contents

**Cases**

Alexander v. City of Syracuse,
    132 F.4th 129 (2d Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Anilao v. Spota,
    774 F. Supp. 2d 457 (E.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 59, 64

Ashley v. City of N.Y.,
    992 F.3d 128 (2d Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48

Baez v. Hennessy,
    853 F.2d 73 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Barbera v. Smith,
    836 F.2d 96 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Barnes v. City of N.Y.,
    68 F.4th 123 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46, 48

Bellamy v. City of N.Y.,
    914 F.3d 727 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Bermudez v. City of N.Y.,
    790 F.3d 368 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Bernard v. Cty. of Suffolk,
    356 F.3d 495 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 51, 59, 63

Blaskewicz. v. Cnty. of Suffolk,
    29 F. Supp. 2d 134 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 30

Boyd v. City of N.Y.,
    336 F.3d 72 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Buari v. City of N.Y.,
530 F. Supp. 3d 356 (S.D.N.Y. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Burns v. Reed,
500 U.S. 478 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Cameron v. City of N.Y.,
598 F.3d 50 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Carruthers v. Colton,
___ F.4th ___. 2025 U.S. App. LEXIS 21278 (2d Cir. 2025) . . . . . . . . . . . 48

Chiaverini v. City of Napoleon, Ohio,
602 U.S. 556 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Clinton v. City of N.Y.,
2025 U.S. Dist. LEXIS 89174 (S.D.N.Y. 2025) . . . . . . . . . . . . . . . . . . . . 30

Cunningham v. Cornell Univ.,
86 F.4th 961 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Darnell v. Pineiro,
849 F.3d 17 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Davis v. Kelly,
160 F.3d 917 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Doe v. Phillips,
81 F.3d 1204 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Dorsey v. Gannon,
2024 U.S. App. LEXIS 7446 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . 33

Dufort v. City of N.Y.,
874 F.3d 338 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Eaton v. Estabrook,
144 F.4th 80 (2d Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Edwards v. City of N.Y.,
  2015 U.S. Dist. LEXIS 114039 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . 73

Fed. Defs. of New York Inc. v. Fed. Bureau of Prisons,
  954 F.3d 118 (2d Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Figueroa v. Mazza,
  825 F.3d 89 (2d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Frederick v. Boyd,
  2021 U.S. Dist. LEXIS 120301 (E.D.N.Y. 2021) . . . . . . . . . . . . . . . . . . 65

Gagnon v. Ball,
  696 F.2d 17 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Galgano v. Cnty. of Putnam,
  2024 U.S. Dist. LEXIS 70460 (S.D.N.Y. 2024) . . . . . . . . . . . . . . . . . . . 54

Garcia v. Doe,
  779 F.3d 84(2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Garnett v. Undercover Officer C0039,
  838 F.3d 265 (2d Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45, 46

Gatson v. Coughlin,
  249 F.3d 156 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Gil-Cabrera v. Dep't of Corr.,
  2021 U.S. Dist. LEXIS 221479 (S.D.N.Y. 2021) . . . . . . . . . . . . . . . . . . 71

Giraldo v. Kessler,
  694 F.3d 161 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 62

Gonzalez v. Wicked Taco LLC,
  764 F. Supp. 3d 77 (E.D.N.Y. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Graham v. City of New York,
128 F. Supp. 3d 681 (E.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Green v. Harbach,
750 F. App'x 57 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Greene v. City of N.Y.,
742 Fed. App'x 532 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Greene v. City of N.Y.,
465 F.3d 65 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Grice v. McVeigh,
873 F.3d 162 (2d Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Griffin v. City of N.Y.,
67 A.D.3d 550 (1st Dept. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Harrison v. Barkley,
219 F.3d 132 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Hill v. City of N.Y.,
45 F.3d 653 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Horn v. Adger,
2025 U.S. App. LEXIS 14069 (2d Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . 47, 66

Imbler v. Pachtman,
424 U.S. 409 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 61

Jeffery v. City of N.Y.,
113 F.4th 176 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Jocks v. Tavernier,
316 F.3d 128 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34, 46

Johnson v. Pataki,
91 N.Y.2d 214 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Jok v. City of Burlington,
96 F.4th 291 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Kee v. City of N.Y.,
12 F.4th 150 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45, 46

Kinzer v. Jackson,
316 F.3d 139 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kravitz v. Purcell,
87 F.4th 111 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Long v. Vazquez,
2016 U.S. Dist. LEXIS 104837 (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . 45

Long Island Lighting Co. v. Barbash,
779 F.2d 793 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Matter of Abelove v. Cuomo,
57 Misc.3d 668 (Sup. Ct. Alb. Co. 2017) . . . . . . . . . . . . . . . . . . . . . . . . 63

Moran v. Greco,
2024 U.S. App. LEXIS 8830 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . 36

Morse v. Fusto,
804 F.3d 538 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Nzegwu v. Friedman,
605 F. App'x 27 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Oliveira v. Mayer,
23 F.3d 642 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

vii

O'Neill v. Krzeminski,
839 F.2d 9 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Ortiz v. Stambach,
137 F.4th 48 (2d Cir. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Palin v. N.Y. Times Co.,
940 F.3d 804 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

People v. Abelove,
60 Misc.3d 595 (Sup. Ct. Renn. Co. 2018) . . . . . . . . . . . . . . . . . . . . 63

People v. Morgan,
99 A.D.3d 622 (1st Dept. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Perez v. Molina,
2023 U.S. Dist. LEXIS 106850 (S.D.N.Y. 2023) . . . . . . . . . . . . . . . . 72

Platsky v. City of N.Y.,
2025 U.S. App. LEXIS 12039 (2d Cir. 2025) . . . . . . . . . . . . . . . . . . . 32

Provost v. City of Newburgh,
262 F.3d 146 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 68, 72

Ricciuti v. N.Y.C. Transit Auth.,
124 F.3d 123 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Salahuddin v. Goord,
467 F.3d 263 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Sanchez v. State of New York,
99 N.Y.2d 247 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Scott v. Harris,
550 U.S. 372, 380 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

viii

Sejin Precision Indus. Co. v. Citibank, N.A.,
726 F. App'x 27 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Serrata v. Givens,
2019 U.S. Dist. LEXIS 64277 (E.D.N.Y. 2019) . . . . . . . . . . . . . . . . . . . . 69

Seun Ogunkoya v. Monaghan,
913 F.3d 64 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Simon v. City of New York,
727 F.3d 167 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Singh v. City of N.Y.,
2024 U.S. App. LEXIS 1898 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . 35

Smalls v. Collins,
10 F.4th 117 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Smith v. Garretto,
147 F.3d 91 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Soares v. State of N.Y.,
68 Misc.3d 249 (Sup. Ct. Alb. Co. 2020) . . . . . . . . . . . . . . . . . . . . . . . . 64

Swartz v. Insogna,
704 F.3d 105 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Travelers Ins. Co. v. Carpenter,
411 F.3d 323 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Triolo v. Nassau Cty.,
24 F.4th 98 (2d Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40, 74

U.S. ex rel Mar. Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co.,
889 F.2d 1248 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

U.S. v. Rivas,
    377 F.3d 195 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

U.S. ex rel. Toth v. Quarles,
    350 U.S. 11 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Van de Kamp v. Goldstein,
    555 U.S. 335 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

Walker v. Schult,
    717 F.3d 119 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Walsh v. City of N.Y.,
    742 F. App'x 557 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Warney v. Monroe County,
    587 F.3d 113 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Williams v. Citigroup Inc.,
    659 F.3d 208 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Willey v. Kirkpatrick,
    801 F.3d 51 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Ying Jing Gan v. City of New York,
    996 F.2d 522 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

In re Y.K.,
    87 N.Y.2d 430 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Zahrey v. Coffey,
    221 F.3d 342 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 51, 59, 60, 61

**Statutes**

N.Y.C. Admin. Code § 8-802 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 64, 65, 74

P.L. § 35.15(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34, 38, 66

P.L. §§ 35.20(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34, 38, 65, 66

P.L. § 120.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

P.L. § 135.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34

P.L. § 195.00(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## JURISDICTION

Plaintiff-Appellant Jose Alba brought this action under 42 U.S.C. § 1983, claiming various constitutional violations. The district court therefore had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

On January 3, 2025, the district court adopted the Report and Recommendation ("R&R"), dated August 26, 2024, granted defendants' motion to dismiss the First Amended Complaint ("FAC"), and granted plaintiff leave to amend and demonstrate that his new pleading was not futile. On August 21, 2025, the district adopted the R&R, dated July 18, 2025, denied plaintiff's motion to file a Second Amended Complaint ("SAC") and entered final judgment. (JA360). As plaintiff filed a notice of appeal on August 25, 2025 (JA361), this Court has appellate jurisdiction under 28 U.S.C. § 1291. Plaintiff also appeals from the orders of the magistrate judge ("magistrate"), dated January 3, 2024 and February 3, 2025, and the final August 21, 2025 order, denying plaintiff discovery. (JA28-36, 360). The R&Rs and the orders adopting them are substantially similar, and although this brief focuses on the allegations in the SAC, the arguments herein apply to all orders appealed from.

## STATEMENT OF THE CASE

Plaintiff used force to protect himself and to prevent or terminate a burglary against a larger individual who violently attacked plaintiff while he was working

1

as a clerk in a Manhattan convenience store. After being falsely arrested, maliciously prosecuted, and deprived of other rights, plaintiff brought this action, pursuant to federal, state and city law, asserting claims against, *inter alia,* the City of New York, numerous law enforcement officers involved in his arrest and prosecution, and Manhattan District Attorney ("DANY") Alvin Bragg and unidentified DANY prosecutors and officials. In addition, plaintiff asserts claims under New York law and N.Y.C. Admin. Code §§ 8–802 through 8-808, for which a law enforcement officer has no legal immunity. Plaintiff also sues Department of Correction ("DOC") Commissioner Louis Molina and unidentified DOC employees for violations of federal and state law.

Bragg and the City defendants moved to dismiss the FAC. After the district court (Kaplan, D.J.) granted plaintiff leave to amend, the court denied plaintiff's motion to file a SAC and closed the case. Both orders followed R&Rs. The lower court rulings are reported at 2024 WL 5359912 (R&R), 2025 WL 26771 (adopting R&R), 2025 WL 2420960 (R&R), and 2025 WL 2419573 (adopting R&R).

## STATEMENT OF FACTS

The following allegations and photographs are derived from: (a) the FAC and the proposed SAC (JA41, 234); (b) Bragg's Day One Letter & Day One Policy & Procedure Memorandum, dated January 3, 2022 ("Day One Memo") (JA326-335), cited in the pleadings; (c) the reports of Detectives William Garcia

2

and Carlos Caban ("Detectives' Reports") (JA93-132), which the district court deemed integral to plaintiff's pleadings; and (d) the video interrogation of Tina Lee, a/k/a Erica Grady, deemed integral to the pleadings, and submitted by the City to the Court directly in hard copy. The FAC and SAC contain links to the sources of the allegations.

**1. Introduction.**

Plaintiff is a senior citizen with no arrest or criminal history. On July 1, 2022, at approximately 11:06 p.m., he used deadly force to protect himself and to prevent or terminate a burglary against a larger, aggressive individual with a criminal record, Austin Simon, 35, who violently attacked him while plaintiff was working as a clerk in a Manhattan convenience store/bodega. Simon was on parole for a violent crime and has a violent history. During the attack, plaintiff was stabbed by Simon's girlfriend, Tina Lee, who had incited Simon to attack plaintiff because the store was unable to process her public assistance benefit card. (JA203-221, 234-239, 261-62, 41, 56-57). Defendants and the R&Rs refer to Lee as Erica Grady, the alias she gave to the police.

After plaintiff was arrested, Bragg and his subordinates charged plaintiff with murder in the second degree, and asked for substantial bail at plaintiff's arraignment, claiming the case was "strong" based on a store video. Because plaintiff was unable to post bail, he was incarcerated at Rikers Island under

3

inhumane conditions and deprived of adequate medical care for his stab wounds. (JA261-268, 61-66, 183-189).

As the public was outraged over plaintiff's arrest and prosecution, Bragg agreed to lower plaintiff's bail approximately one week later if he agreed to surrender his passport and wear an ankle monitor. Plaintiff agreed and was released. Following plaintiff's arraignment, Bragg made public statements about the case. Bragg ultimately dismissed the murder charge in a written motion, dated July 14, 2022, which demonstrated, contrary to Bragg's initial intentions, there was no probable cause to arrest or prosecute, as plaintiff had two indisputable justification defenses known to Bragg and the other defendants from the outset. (JA271-273, 278-297, 203-221, 64-69).

Bragg stated that, after commencing the prosecution, he conducted a "criminal investigation" to determine "whether and what charges should be brought" and to "guard against prosecution of the innocent." The motion further stated that a prosecution should be based on facts, not "premature beliefs or conclusions." (*Id.*).

## 2. The Attack.

On July 1, 2022, shortly after 11:00 p.m., plaintiff was working at the Blue Moon convenience store in Manhattan. Simon entered the store, at the urging of Lee, who was angry with plaintiff because her food stamp card was declined. As

corroborated by Bragg's subsequent motion to dismiss the murder charge, Lee was screaming and told plaintiff that Simon was going to attack him. Lee knocked goods off the store counter and left to get Simon, repeatedly shouting, through a vulgarity and a racial slur, that Simon was "gonna come down here right now and fuck you up." Upon entering, Simon went behind the store counter to attack and menace plaintiff, which amounted to a burglary under New York law. Under the Penal Law, plaintiff had legal justification to use deadly force to stop the commission of the burglary and in defense of his person. (JA 271-273, 278-297, 203-221, 41, 56-57).

As corroborated by Bragg's motion to dismiss the murder charge, Simon entered the store and is heard on the surveillance tape repeatedly saying to plaintiff from outside the counter area, "Come on, come out" and "fight me," and motioned with his hands for plaintiff to exit from behind the counter. Plaintiff did not come out and the surveillance video records him saying, "I don't want a problem, papa." Plaintiff was 61 years old and 5'7"; Simon was 35 years old and 6 feet tall. (JA271-273, 278-297, 203-221, 67-68).

As corroborated by Bragg's motion, Simon entered the open door that leads into the small private area behind the counter, and, using a vulgarity, said, "What's wrong with you? Why you snatch anything out of her hands," and moved to within inches of plaintiff. When plaintiff continued to serve a customer,

5

Simon forcefully pushed him against a wall of shelving. Plaintiff's back struck the shelving and he fell into a seat. Plaintiff stayed where he had been pushed, was silent, and averted Simon's gaze. (*Id.*).

Simon stood directly in front of plaintiff, inches away, and gesticulated and yelled. Simon had a box cutter that was visible in his right front pocket. Simon grabbed plaintiff by the back of the collar, lifted him from where he had been thrown, and forcibly moved plaintiff from the back of the counter area to bring plaintiff outside to fight. At this point, plaintiff used a knife to stop or prevent a burglary and to defend himself. Lee stabbed plaintiff at least twice while he was struggling with Simon. (*Id.*). *See* Penal Law, Article 35 (Defense of Justification); § 35.15 Justification: Use of Physical Force in Defense of a Person; § 35.20 Justification: Use of Physical Force in Defense of Premises and in Defense of a Person in the Course of Burglary.

After plaintiff stopped the burglary and defended himself, he told a customer to call the police. The incident was captured on video on the Blue Moon video surveillance system. Several NYPD officers arrived minutes later, and Simon received medical attention. The responding officers included defendants Police Officer Anthony Lall, Officer Malvin Rodriguez, Lieutenant Chandradeo Etwaroo, Sergeant Ruppert Mark, Sergeant Olga Peralta and other unidentified

6

officers. Detectives William Garcia and Carlos Pagan and/or other unidentified detectives also arrived on the scene. (JA271-273, 278-297, 203-221, 58-60).

Prior to arresting him, defendants did not obtain plaintiff's version of events or interview any witnesses or customers. No witnesses inculpated plaintiff. Lee did little more than point to plaintiff at the scene and provided no facts to help defendants determine what happened. (*Id.*).

According to Bragg's motion, his criminal investigation revealed that, when the police arrived on the scene, a police lieutenant knew "only that an individual had been stabbed and was bleeding." "[A]nother officer then told the lieutenant that he believed Alba was the stabber," not indicating why. Bragg's motion does not state any witnesses inculpated plaintiff. (JA203-221, 271-273, 278-297).

Despite plaintiff's visible stab wounds, defendants took plaintiff to the 30th Precinct, where he was put in a detention room while bleeding. DANY prosecutors were likely in the precinct – standard procedure in homicide cases – and Lee was released without charges. Defendants did not arrest and prosecute Lee even after Bragg's motion showed that Lee had not acted in lawful defense of a third person. Lee could have been properly charged with crimes under the Penal Law, including assault, menacing, reckless endangerment, assault on a retail worker, harassment, and possession of a weapon with intent to use unlawfully. (JA264-265, 281, 290, 59).

7

Before plaintiff was formally charged with murder in the precinct, Lee was interrogated by Detectives Caban and Garcia and a third detective. Lee did not corroborate defendants' position that plaintiff was the aggressor. As shown below, the Detectives and the other defendants knew Lee was not credible. In contrast to the district court's conclusion that Lee observed the incident and provided probable cause to arrest plaintiff, Lee told the Detectives that she did not see what happened behind the store counter. During the interrogation, the Detectives told Lee she was being "detained," Lee was read her *Miranda* rights, she gave a fictitious name and she denied stabbing plaintiff even after being shown photos of plaintiff's injuries. Lee then admitted she was carrying a knife, and Caban told Lee she needs to start telling the truth. Caban showed Lee the store video which was on his cellphone. (JA263-266, 59).

The Detectives' Reports and the video interrogation of Lee provide more detail. The Detectives' Reports state at various points (JA93-132):

(a) "Homicide, Justifiable."

(b) Simon "became i[]rate an[d] went behind the counter where dispute continued."

(c) Simon went "behind the Deli counter and pushed Mr. Alba."

(d) "Upon further investigation, incident deemed a justifiable homicide."

(e) Lee "blamed herself" for the incident.

8

Also, Lee said during the interrogation that Simon went behind the counter, but she did not observe what took place. (JA263-266, 93-132). Despite this, both R&Rs concluded that Lee provided a credible report of a crime.

The video of the Lee interrogation is incomplete. It shows the Detectives stepped out and likely discussed Lee's answers and criminal conduct with each other and the prosecutors observing behind the one-way mirror. (JA263-266). Lee was released, never charged, and Bragg presented her as a credible witness in the accusatory instrument filed against plaintiff.

While it is undisputed that defendants had the store video when they formally charged plaintiff, the magistrate ruled that defendants were not obligated to "hunt for store security footage." (SA40, 53). The SAC, however, alleged that the video was immediately available to all defendants, and the FAC alleged similar facts. (JA237, 44, 68). The Detectives' Reports state that Officer Lenihan, one of the initial officers to respond to the incident, had "video … from inside the store" which "captur[ed]" Simon going behind the counter and pushing plaintiff. (JA106).

The Detectives' Reports show that the defendants on the scene conducted a perfunctory investigation. Despite his requests for discovery, most of the officers and at least one detective remain unidentified to plaintiff. The Reports reveal that

9

responding officers simply removed and arrested plaintiff and did not speak with any witnesses other than Lee. (JA93-132).

Before his arraignment, plaintiff was taken to Harlem Hospital, where he received sutures to his stab wounds. The NYPD returned plaintiff to the precinct and then took him to Manhattan Central Booking to await arraignment. (JA59). An article from NBC news, reported on July 2, 2022, shows that after plaintiff was arrested, but apparently before his arraignment, the "police called [plaintiff's actions] self-defense." (JA265).

Plaintiff was charged with murder in the second degree in a Criminal Complaint signed by Detective Garcia, with the acquiescence of the other officers and Detectives who failed to intervene and helped and acted in concert with him. Working with Bragg and/or prosecutors and DANY officials, Garcia and the other defendants misrepresented, or allowed Garcia to misrepresent, the video of the incident to put forward a false narrative so plaintiff could be charged with murder. Prosecutors and officials at DANY not directly involved in the prosecution and the drafting of the Criminal Complaint failed to intervene.

Detective Garcia stated in the Criminal Complaint, dated July 2, 2022:

I reviewed *surveillance video* from the store depicting the following:

At approximately 11:05 PM, Mr. Simon entered the area behind the counter. Mr. Simon was carrying a *small white towel* in his left hand and his right hand was *empty*. Mr. Simon pushed the defendant *once* and *spoke* to him while the defendant *sat in a chair* behind the

10

counter. Mr. Simon then put the towel in his pocket and *attempted to steer* the defendant out of the area behind the counter, *but the defendant* picked up a kitchen knife that was stashed behind the counter and stabbed Mr. Simon in the neck and chest at least five times. Informant [Tina Lee] attempted to pull the defendant away from Mr. Simon and held the defendant's right arm but the defendant continued to stab Mr. Simon. Informant then took a knife from her purse and stabbed the defendant's arm. Mr. Simon fell to the ground, face-down and bleeding.

(JA181, 266, 60). The Criminal Complaint was based solely on a purported description of the store video. No statements by Lee or any witnesses corroborating the above false narrative were included in the Criminal Complaint, as such does not exist. The Criminal Complaint omitted the words on the audio recording, which contained Simon and Lee's threats, and also omitted Simon and Lee's violent and unlawful acts, including Simon's burglary by going behind the counter to attack plaintiff, and his attempt to bring plaintiff outside to fight him. (*Id.*).

The Detectives' Reports show the investigation remained open after the arraignment. The Reports further state that, on July 5, 2022, the Detectives, still in the investigative stage, reviewed the body camera videos of the 30 responding officers and found nothing inculpatory. (JA93-132).

In contrast to the Criminal Complaint, Bragg's motion to dismiss revealed the threats and unlawful acts of Simon and Lee, which all defendants intentionally

11

omitted and mischaracterized in the Criminal Complaint. Addressing plaintiff's justification defenses, Bragg stated:

(a) Simon's "death stemmed from a physical confrontation that Simon started."

(b) Lee yelled at plaintiff and knocked goods off the counter when plaintiff took the potato chips from her daughter's hand, and threatened plaintiff.

(c) Simon entered the store about five minutes later with Lee "and can be heard on the surveillance tape repeatedly saying from outside the counter area, 'Come on, come out,' to Alba, and motioned with his hands for Alba to exit from behind the counter."

(d) "Alba told the police that Simon said, 'Come with me, come fight me, come! Cause she is my wife; come fight me!'"

(e) When plaintiff did not leave the area behind the counter and said, "I don't want a problem, papa," Simon "entered the open door that leads into the small private area behind the counter, said '[Expletive], what's wrong with you? Why you snatch anything out of her hands,' and moved to within inches of Alba's body."

(f) "Simon forcefully pushed Alba against a wall of shelving, Alba's back struck the shelving and he fell into a seat in front of it."

12

(g) "Alba stayed where he had been pushed, was silent, and averted his gaze."

(h) "Simon stood directly in front of Alba, inches away, and gesticulated and yelled ... 'You're gonna say sorry to my daughter.'"

(i) Simon had a boxcutter in his right front pocket and "the end of the boxcutter [was] visible."

(j) "Simon grabbed Alba by the back of the collar, lifted him from where he had been thrown, and forcibly moved Alba from the back of the counter area towards its door."

(k) "With Simon holding Alba by the collar and pushing him out of the counter area, Alba reached down for a knife kept on a shelf beside the counter."

(l) "A struggle began as soon as Alba grabbed the knife. As they struggled, Alba repeatedly stabbed Simon."
(JA203-221).

Bragg concluded that, given the difference in age and size of plaintiff and Simon, the attacker's threats and,

> Simon's conduct in entering the store's small, private area, throwing Alba against the wall to a place he could not escape, and grabbing him by the collar could inspire deep fear in an older and shorter man as to what might be in store next. This was also in the context of the girlfriend saying five minutes earlier that her boyfriend was going to "come down here right and fuck you up."

(*Id.*).

13

In other words, plaintiff had a "deep fear" of what Simon was going to do to him once he brought plaintiff outside the store.

The above facts, known to the defendants from the beginning (as the incident was captured on video), were omitted from the Criminal Complaint to make plaintiff appear culpable for a crime he did not commit, and to minimize Simon's conduct and characterize him as the victim. Plaintiff was charged with murder in the second degree instead of lesser and/or lesser included offenses contained in P.L. § 125.00, which would have resulted in substantially lower bail.

Bragg and his subordinates did not follow Bragg's new policies, set forth in his "Day One Memo," of charging criminal defendants with lesser included offenses, or just lesser offenses, such as manslaughter; "Restorative Justice," which Bragg offers for even violent crimes; or deferral of prosecution where further investigation was warranted. Although plaintiff is a citizen, Bragg's Memo also offers pleas to criminal defendants who are in the county illegally that will prevent deportation. (JA326-335).

Following his arraignment and the imposition of bail, plaintiff was held under unconstitutional conditions at Rikers and was denied protection from contracting Covid-19 and other infectious diseases. Plaintiff was in an intake cell for approximately two days in violation of DOC policy and City law. (JA63-66,

14

70-74. The New York Post has published photos of the conditions in the intake cells.



Plaintiff was held under the conditions shown in the above photo, except his cell, while less crowded, was still overcrowded. Plaintiff is unaware of the names of the DOC employees who oversaw the intake area, but DOC Commissioner Molina and other DOC officials are aware, having seen the area and heard about it from subordinates and reports. Further, it has been reported that many detainees were kept in intake cells beyond the period permitted by City law and that DOC employees falsified records regarding these time periods. Molina and other unidentified DOC officials knew this was taking place through observations and from subordinates and reports. The conditions at Rikers are well known. Bragg

15

was aware of the conditions, describing Rikers as a "humanitarian crisis" and an "ongoing crisis." (*Id.*).

After his arrival at Rikers, plaintiff was taken to a jail clinic where it was determined that his stab wounds needed to be cleaned twice daily and he needed medication to prevent or cure an infection and alleviate pain. Despite plaintiff's numerous requests, the correction officers and medical staff did not ensure plaintiff received this treatment and medication. Correction officers only took plaintiff for follow-up care one time. Plaintiff is unaware of the names of the DOC employees, but Molina and other DOC officials were aware of the unconstitutional medical care, having seen the practices and heard about it from subordinates, reports, the media, and lawsuits. The DOC has been held in contempt in Supreme Court, Bronx County, for systemically not taking' inmates for medical care. (*Id.*).

While plaintiff remained in custody, Bragg responded to the public outrage over plaintiff's arrest and prosecution by admitting he was still "investigating." Bragg's spokesperson repeated the assertion almost two years later, well after this case was filed. After plaintiff's arraignment, Bragg stated he had "not committed" to prosecuting plaintiff and "[w]e are continuing to review the evidence and the investigation is ongoing." Bragg met with the United Bodegas of America concerning plaintiff's prosecution, and, on July 12, 2022, the media

16

reported that, following this meeting, Bragg said plaintiff "could see the charges dropped" and, "I don't understand why people are jumping to conclusions. I have not made a determination. I am investigating." Almost two years later, CNN reported that "a Bragg spokesperson told CNN[,] on April 16 or 17, 2024, 'This matter was resolved nearly two years ago, and the charges were dismissed after a thorough investigation[.]'" (JA64-65).

Following his "criminal investigation," Bragg filed his motion to dismiss revealing the justification defenses of which defendants were aware from the outset. Bragg's motion demonstrated that he conducted the type of investigation expected of law enforcement prior to making an arrest. Bragg wrote that "[t]he purpose of this [investigation], as is true of all criminal investigations, was to develop sufficient factual information to enable the prosecutor to make a fair and objective determination of whether and what charges should be brought," to "guard against prosecution of the innocent," and to avoid basing a prosecution on "premature beliefs and conclusions as to guilt or innocence." Bragg added, "The [DA's] investigation included interviews of civilian witnesses to the stabbing and those who called 911, the police officers and emergency medical technicians who responded to the scene, and the medical examiner. The People visited the crime scene and examined physical evidence. We reviewed medical records. And we analyzed extensive video evidence,

17

including portions not publicly available. The video evidence included surveillance video taken by cameras both inside and outside the Blue Moon." Bragg's motion contained video stills of the incident. (JA203-221).

The following are publicly available video stills and photographs of Simon and Lee attacking plaintiff contained in the SAC. (JA290-297):



nypost.com/2022/07/09/nyc-bodega-clerk-jose-alba-tried-to-avoid-confrontation-that-led-to-his-arrest-video





yahoo.com/news/nyc-lawyers-insist-bodega-clerk-173620051.html



foxnews.com/us/manhattan-da-moves-drop-murder-charge-nyc-bodega-worker-deadly-stabbing



20

foxnews.com/us/brother-man-killed-new-york-bodega-worker-self-defense-preparing-sue-store





newsnationnow.com/on-balance-with-leland-vittert/nyc-mayor-defends-bodega-worker-accused-of-deadly-stabbing

21



metro.co.uk/2022/07/19/new-york-bodega-worker-who-stabbed-attacker-has-murder-charge-dropped-17031691



foxnews.com/us/brother-man-killed-new-york-bodega-worker-self-defense-
preparing-sue-store



reason.com/2022/07/08/charging-a-bodega-worker-who-stabbed-his-attacker-isnt-
criminal-justice-reform



dailymail.co.uk/news/article-11003097/Bodega-worker-61-reveals-injuries-suffered-trying-fend-gangster-girlfriend.html

## PROCEDURAL HISTORY

Defendants moved to dismiss the Complaint pursuant to Rule 12(b)(6), and the City defendants moved alternatively for summary judgment. Plaintiff filed a FAC and defendants re-filed their motions. Plaintiff requested discovery and an initial conference to identify the unknown defendants and to acquire evidence to explore and counter the exhibits submitted with defendants' motions. (JA336-343). On January 3, 2024, the magistrate denied plaintiff's motion for discovery and for an initial conference. As for the motions to dismiss the FAC, the district court adopted the R&R, dated August 26, 2024, in the Memorandum Opinion, dated January 3, 2025, dismissing the FAC and granting plaintiff a final opportunity to amend. The magistrate again denied plaintiff's motion for discovery in the order, dated February 3, 2025.

Plaintiff moved to file a SAC and sought discovery. The magistrate issued an R&R, dated July 18, 2025, recommending that the district court deny plaintiff's motion for leave to file a SAC. The motion for discovery was ignored. Plaintiff pointed out in his objections, *inter alia*, that the magistrate denigrated plaintiff's undisputed justification defense to stop the commission of a burglary as a "beefed up" claim (SA87), but that neither the magistrate nor defendants addressed this defense. Plaintiff requested oral argument, which the court denied before receiving defendants' responses.

25

On August 21, 2025, plaintiff informed the district court of a decision issued by this Court the day before. A short time later, the district court adopted the R&R in the Memorandum Opinion, dated August 21, 2025, and closed the case. The district court stated that the R&R "ably dispatche[d]" (SA135) plaintiff's claims. Judgment was entered on August 21, 2025. A notice of appeal was filed on August 25, 2025.

## QUESTIONS PRESENTED

1. Whether there was probable cause to arrest and prosecute plaintiff for murder in the second degree?

2. Whether defendants deprived plaintiff of a fair trial and due process?

3. Whether plaintiff sufficiently alleged constitutional violations arising from his incarceration at Rikers?

4. Whether plaintiff sufficiently alleged a claim for failure to intervene against the individual defendants?

5. Whether Bragg, Molina and the officers and detectives other than defendant Garcia were personally involved in the constitutional violations?

6. Whether Bragg is entitled to absolute immunity?

7. Whether plaintiff's substantial rights were violated when he was denied any discovery, including initial disclosures, to counter and explore the evidence

that defendants submitted with their motions, and which prevented plaintiff from learning the identities of the unidentified defendants?

8. Whether defendants state law claims may proceed, which were not substantively addressed in the orders appealed from?

## SUMMARY OF ARGUMENT

1. Plaintiff was falsely arrested and maliciously prosecuted although he had justifiably used deadly force under P.L. § 35.20(3) because his attacker went behind the store counter to attack and menace him, which amounted to a burglary under New York law. As Bragg acknowledged, when Simon went behind the counter, he unlawfully restrained plaintiff, which amounted to Unlawful Imprisonment in the Second Degree. P.L. § 135.05, and menaced plaintiff, attempting to place plaintiff in fear of "imminent ... physical injury," Menacing in the Third Degree, P.L. § 120.15. Plaintiff also justifiably used force in defense of his person under P.L. § 35.15(2), as Simon told plaintiff to come out from the counter to fight him, and, when plaintiff declined, Simon went behind the counter to pull plaintiff out to bring him outside.

2. Defendants deprived plaintiff of a fair trial and due process when, knowing what the store video depicted, they created a false and misleading Criminal Complaint, with material omissions, purporting to describe the store

27

video, in order to charge plaintiff with murder and detain him while they continued to investigate to acquire probable cause.

3. Defendants denied plaintiff due process in violation of *Brady* by withholding exculpatory information including, but not limited to, the accurate store video; the contents of the video including the threats and criminal and violent acts of plaintiff's two attackers; that one of the attackers was objectively observed in the video committing a burglary and attacking plaintiff and trying to bring him outside to fight; and the second attacker, during her interrogation by Detectives, admitted she did not see the altercation that led to the other attacker being killed, and, among other fabrications, misrepresented that she did not stab plaintiff with her knife.

4. Bragg was not entitled to absolute immunity when the FAC and the SAC plausibly alleged that he was not engaged in his advocacy function as a prosecutor but was instead conducting a criminal investigation after commencing a prosecution; prosecuted plaintiff before acquiring probable cause; acted as an administrator; prosecuted plaintiff for personal reasons; and acted without any colorable claim of authority and/or intertwined his exercise of authorized prosecutorial discretion with unauthorized conduct.

28

5. Plaintiff sufficiently alleged a violation of due process and negligence arising out of his incarceration at Rikers, where he was held under inhumane conditions and deprived of prescribed medical care for his stab wounds.

6. Plaintiff sufficiently alleged a claim for failure to intervene and that defendants acted collectively as a group, including the unidentified defendants, and plaintiff was unlawfully denied discovery to determine each defendant's specific role and the identities of others involved.

7. Plaintiff's substantial rights were violated when he was denied any discovery, including initial disclosures, to explore and counter the evidence that defendants submitted with their motions to dismiss, and to determine the identities of the unidentified defendants.

8. Although not substantively addressed in the orders appealed from, plaintiff's state law claims are viable.

## STANDARD OF REVIEW

This Court reviews *de* novo the dismissal of a complaint under Rule 12(b)(6), "accepting as true all factual allegations in the complaint and drawing all reasonable inferences in [the plaintiff's] favor. … We generally review a district court's decision to permit or deny leave to amend a complaint for abuse of discretion, keeping in mind that leave to amend should be freely granted when justice so requires. Where a district court denies a motion to amend a complaint

29

based on an interpretation of law 'such as futility, we review *de novo.''* *Green v. Harbach*, 750 F. App'x 57, 58 (2d Cir. 2019).[1]

"[T]he mandate of Fed. R. Civ. P. 15(a) that leave to amend shall be freely given when justice so requires reversal of denials of leave to amend where the challenged denial exceeds the bounds of judicial discretion." *U.S. ex rel Mar. Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 889 F.2d 1248, 1255 (2d Cir. 1989). "This rule [as well as Rule 20] also allows for the addition of new parties." *Blaskiewicz v. Cty. of Suffolk*, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998). "This permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011). "[T]he adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *Id.* The allegations in a pleading are to be analyzed "as a whole drawing all reasonable inferences in the plaintiff's favor." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 979 (2d Cir. 2023). "[A] plaintiff may plead multiple—sometimes contradictory—theories of liability. When that is the case, it is incumbent on the court to address each theory on its own merit, separating out as necessary the allegations underlying the various claims." *Id.* at 979. "[I]t is well-established in the Second Circuit that '[t]he

---

[1] All F. App'x citations and  Second Circuit, non-F.4th appellate citations, are summary orders.

burden of proving futility rests on the party opposing the amendment.'" *Gonzalez v. Wicked Taco LLC*, 764 F. Supp. 3d 77, 109 (E.D.N.Y. 2025).

## ARGUMENT

### POINT I

**PLAINTIFF PLAUSIBLY ALLEGES CLAIMS OF FALSE ARREST AND MALICIOUS PROSECUTION UNDER FEDERAL, STATE AND CITY LAW**

"The elements of false arrest and malicious prosecution under § 1983 are 'substantially the same' as the elements under New York law." *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003). Plaintiff also asserts an unlawful seizure claim against the officers and detectives under N.Y.C. Admin. Code §§ 8–802-07, for which no legal immunity is available, § 8-804, and is a remedy in addition to claims at common law, § 8–803(d). *Clinton v. City of N.Y.*, 2025 U.S. Dist. LEXIS 89174, at *23 n.4 (S.D.N.Y. 2025).

The City is vicariously liable for the individual defendants' violations of plaintiff's rights under state and city law because they acted within the scope of their employment. *Triolo v. Nassau Cnty.,* 24 F.4th 98, 110 (2d Cir. 2022). In addition, even if a law enforcement defendant is entitled to immunity, including the City defendants, Bragg, and all unidentified defendants, the municipality remains liable for the unlawful immune acts. *Id.* at 110-113.

31

In determining whether probable cause exists, an arresting officer must examine the "totality of the circumstances," including exculpatory information. *Id.* at 106. An officer is not permitted to "deliberately disregard facts known to him which establish justification." *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003). "Justification, including both emergency measures and self-defense, is an exculpatory defense." *Id.* at 135. "Defenses which negate the existence of a crime … negate probable cause." *Id.; see Garcia v. Doe*, 779 F.3d 84 93 (2d Cir. 2014); *Walsh v. City of N.Y.*, 742 F. App'x 557, 561 (2d Cir. 2018); *Jocks*, 316 F.3d at 136; *Nzegwu v. Friedman*, 605 F. App'x 27, 31 (2d Cir. 2015).

The R&Rs state that defendants were not obligated to "hunt" for a store video of the incident. (SA40, 53). However, the SAC alleges, and the FAC similarly alleges, that the video was immediately available to, and in the possession of, the defendants. This was corroborated in the Detectives' Reports, and the video of the interrogation of Lee shows Detective Caban had the video on his cellphone. Defendants never contended otherwise nor claimed anyone had to "hunt" for the video. This Court requires only that exculpatory evidence be available to the arresting officers. *Platsky v. City of N.Y.*, 2025 U.S. App. LEXIS 12039, at *4 (2d Cir. 2025) ("[W]e consider those facts *available to the officer* at the time of the arrest and immediately before it") (emphasis in original).

Defendants lacked probable cause to arrest and prosecute plaintiff, and once they acquired the video, any arguable probable cause dissipated. "We have made clear that probable cause 'dissipates' where 'a police officer's awareness of the facts supporting a defense … eliminate[s] probable cause.'" *Grice v. McVeigh*, 873 F.3d 162, 176 (2d Cir. 2017).

Police officers can "initiate" a prosecution by filing false charges or other accusatory instruments and are not absolved of liability by any "independent decision" of the prosecutor. *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010). Probable cause must continue to exist for "the duration of the prosecution." *Dorsey v. Gannon*, 2024 U.S. App. LEXIS 7446, at *4 (2d Cir. 2024). "A malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant." *Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003). Malice may be inferred from the lack of probable cause and defendants' reasons to prosecute plaintiff other than to see the ends of justice served. *Dufort v. City of N.Y.*, 874 F.3d 338, 353 (2d Cir. 2017).

The Supreme Court has held that the existence of probable cause for one charge in a criminal proceeding does not bar bringing a malicious prosecution claim relating to other baseless charges. *Chiaverini v. City of Napoleon*, 602 U.S. 556, 561-63 (2024); *Alexander v. City of Syracuse*, 132 F.4th 129 (2d Cir. 2025).

33

Similarly, this Court has specifically "held that the police had probable cause to arrest but nonetheless reversed the district court's grant of summary judgment on the malicious prosecution claim because there was proof that the officers had later manufactured false evidence." *Jocks*, 316 F.3d at 138. Even if defendants had probable cause to arrest plaintiff, because of the fabrication, omissions and withholding of exculpatory evidence, plaintiff's malicious prosecution claim may proceed.

### A. Penal Law § 35.20(3) (*Deadly Force to Prevent or Terminate a Burglary*).

The Criminal Complaint filed by Bragg and sworn to by Detective Garcia, with the help and knowledge of the other defendants, set forth the case against plaintiff, drawing from Garcia's purported review of the store video.

The SAC provides two independent bases for plaintiff's claim that he was arrested and prosecuted without probable cause: P.L. §§ 35.20(3) and 35.15(2). As Bragg indicated in his motion to dismiss the murder charge, plaintiff could use deadly force based on what appeared in the store video to stop Simon's commission of a burglary when he went behind the store counter to menace and attack plaintiff. Penal Law § 35.20(3) states:

> A person in possession or control of, or licensed or privileged to be in, a dwelling or an occupied building, who reasonably believes that another person is committing or attempting to commit a burglary of such dwelling or building, may use *deadly* physical force upon such other person when he or she reasonably believes such to be necessary

34

to *prevent or terminate the commission or attempted commission* of such burglary.

(emphasis added). As Bragg further stated in his motion, when Simon went behind the counter, he unlawfully restrained plaintiff, which amounted to Unlawful Imprisonment in the Second Degree. P.L. § 135.05, and menaced plaintiff, attempting to place plaintiff in fear of "imminent ... physical injury," Menacing in the Third Degree, P.L. § 120.15.

This justification defense, particularly the undisputed fact that Simon went behind the counter to attack and restrain plaintiff, amounting to a burglary, negated probable cause. Defendants were in possession of the video showing this, as established by the video stills contained in the SAC (JA290-297), and in Bragg's motion filed in criminal court.

**B. Penal Law § 35.15(2) (*Deadly Force in Defense of Person*).**

The accurate and complete store video of the altercation between plaintiff and his two assailants, described in Bragg's motion to dismiss, shows defendants lacked probable cause to arrest and prosecute plaintiff, whose actions were further justified under P.L. § 35.15(2).

In determining whether a district court may properly consider a video submitted with a motion to dismiss a pleading, on the ground that it is integral to the pleading, the video must be accurate, complete and "blatantly contradict" the pleadings. *Singh v. City of N.Y.*, 2024 U.S. App. LEXIS 1898, at *16-17 (2d Cir.

2024) (rejecting video because it lacked sound and "does not allow a factfinder to consider the nature and tone of the exchange between [the parties] … prior to the application of force. Moreover, the vantage point of the video does not allow the factfinder to determine with pinpoint accuracy the distances between [the parties] … at the time the force was applied and, under the totality of the circumstances, allows for fair debate about how [plaintiff's] movement would reasonably be perceived."); *Moran v. Greco*, 2024 U.S. App. LEXIS 8830, at *12 n.3 (2d Cir. 2024).

The video submitted by defendants to the district court, in contrast to the original video in possession of defendants at the time of arrest, contained material omissions. It lacked many of the threats and menacing statements made by plaintiff's assailants, and some of the threats, profanity and aggressive statements in the submitted video were difficult to understand. The video also omitted the tone and volume of many of the threats.

While plaintiff objected that the incomplete store video submitted by defendants made it impossible to determine whether plaintiff had properly used deadly force in defense of his person, the court decided the video showed that this justification defense, in the court's view, had not been established. (SA74, 136). This was erroneous for two reasons.

36

First, it was not the role of the district court to analyze the video in ruling upon a motion to dismiss or to amend, especially a video that was incomplete and lacked relevant information, such as the threats made against plaintiff. Inferences to be drawn from a complaint, and documents deemed integral to a complaint, are "for the jury, not the court." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019); *see U.S. ex rel. Toth v. Quarles*, 350 U.S. 11, 18 (1955) ("Juries fairly chosen from different walks of life bring into the jury box a variety of different experiences, feelings, intuitions, and habits").

Second, the video submitted by defendants could not be properly considered to determine whether plaintiff properly acted in defense of his person because it was incomplete, *see* cases above, and did not "blatantly contradict" the pleadings and render plaintiff's allegations implausible. *Jok v. City of Burlington*, 96 F.4th 291, 297 n.3 (2d Cir. 2024) (the offered video "d[id] not depict the entire scene' and thus did not 'clearly contradict' plaintiff's version of events") (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007) (video must "blatantly contradict" a party's version)).

**C. Plaintiff's Pleadings Plausibly Alleged False Arrest & Malicious Prosecution.**

The pleadings plausibly alleged false arrest and malicious prosecution. Simon's threats and criminal and assaultive acts, and plaintiff's justification defenses, were captured on a store video, the recording of which was immediately

37

available to, and in defendants' possession, when they arrested and charged plaintiff.

The Detectives' Reports state that Officer Lenihan seized the video when he responded to the store and, during the interrogation of Lee, conducted shortly after plaintiff's arrest, Detective Caban showed the video (which was on his cellphone) to Lee to prod her into retracting her false statements. Bragg and his office had the video as it was the sole basis (although falsely described and containing material omissions), for the Criminal Complaint and the prosecution.

Even though defendants had the video, they charged plaintiff with murder, despite the exculpatory depiction of Simon going behind the store counter and attacking plaintiff and trying to bring him outside the store to fight. Also, the Detectives' Reports state that Simon went behind the counter, which Lee corroborated. Further, Lee stated during her interrogation that she did not see the altercation behind the counter, and, as the Reports indicate, she "blamed herself."

The Criminal Complaint omitted that Simon went behind the counter *without authority to attack plaintiff*, and omitted the facts showing this, thereby amounting to a burglary. This provided plaintiff with justification to use deadly force under P.L. § 35.20(3).

As for the justification defense based on P.L. § 35.15(2), the orders appealed from are based on an incomplete and inaccurate video. Because the

38

particular video submitted by defendants was incomplete and did not "blatantly contradict" plaintiff's allegations, and because a court may not sit as the trier-of-fact to determine whether plaintiff was sufficiently in fear of his personal safety to use deadly force, the orders appealed from should be vacated. A reasonable juror viewing the correct video would conclude as Bragg did in his motion to dismiss the criminal charge:

> Simon's conduct in entering the store's small, private area, throwing Alba against the wall to a place he could not escape, and grabbing him by the collar could inspire deep fear in an older and shorter man as to what might be in store next. This was also in the context of the girlfriend saying five minutes earlier that her boyfriend was going to "come down here right now and fuck you up."

Simon told plaintiff to come out from the counter and go outside to fight him, and, when plaintiff declined, Simon went behind the counter to pull plaintiff out. Plaintiff could only imagine what Simon had in store for him outside the building.

The orders appealed from also ruled that Lee provided a credible report of a crime. (SA7, 40). In *Oliveira v. Mayer*, 23 F.3d 642 (2d Cir. 1994), this Court stated,

> Information about criminal activity provided by a single complainant can establish probable cause when that information is *sufficiently reliable and corroborated* ... Yet, even if bystander witnesses are considered presumptively reliable, a report of a crime alone will not necessarily establish probable cause. ... [B]efore they could lawfully arrest [a]suspect, police officers had a *duty to conduct an investigation into the basis of the witness' report ... Reasonable*

39

*avenues of investigation must be pursued [to establish probable cause] especially when, as here, it is unclear whether a crime had even taken place.*

*Id.* at 647-48 (emphasis added); *see Triolo*, 24 F.4th at 107.

In addition to the fact that all Lee did at the scene was point at plaintiff, which was meaningless, and the store video showed there was no probable cause to arrest plaintiff because of the existence of two justification defenses, defendants knew Lee was not credible and lacked personal knowledge of the facts. Lee told defendants she could not see the altercation behind the counter. Lee was not credible as she unlawfully stabbed plaintiff with her knife more than once, after initially denying it; uses an alias; and blamed herself for Simon's death. Detective Caban's statements during the interrogation showed he and the others suspected Lee of criminal activity and of lying as he told her she was being "detained"; read Lee her *Miranda* rights; and when Lee began lying, said, "I need you to be truthful with me," "We have cameras," "How come you didn't tell us that?" and "How come you didn't tell us that in the beginning?" Defendants obtained no corroboration nor investigated the incident, as required.

Finally, although there were several witnesses and customers in the store, and the Detectives' Reports show that 30 officers responded, the officers spoke with no witnesses, and no witnesses inculpated plaintiff.

40

## POINT II

## PLAINTIFF PLAUSIBLY ALLEGES CLAIMS FOR DENIAL OF A FAIR TRIAL AND DUE PROCESS

As demonstrated in Point I, the Criminal Complaint was misleading, false, and omitted material facts that showed plaintiff had not committed murder, and prejudiced plaintiff through its inaccuracy.

The R&Rs erroneously concluded that the fabrications and omissions would not have made a difference and that the Complaint was not false. (SA61, 123-24). The R&R dated July 18, 2025 did not mention or analyze plaintiff's claim in the SAC that he could utilize deadly force to stop Simon's burglary, instead denigrating plaintiff's right to use deadly force to stop Simon's burglary as a "beefed up" claim. (SA87). Defendants did not address this justification defense, which plaintiff pointed out in his objections. The district court nevertheless adopted the R&R without analysis.

In addition to the arguments and allegations contained in Point I, the Criminal Complaint omitted Bragg's observations, apparent from the store video, that:

(a) Simon's "death stemmed from a physical confrontation that Simon started."

41

(b) Lee yelled at plaintiff and knocked goods off the counter when plaintiff took the potato chips from her daughter's hand, and threatened plaintiff.

(c) Simon entered the store about five minutes later with Lee "and can be heard on the surveillance tape repeatedly saying from outside the counter area, 'Come on, come out,' to Alba, and motioned with his hands for Alba to exit from behind the counter."

(d) "Alba told the police that Simon said, 'Come with me, come fight me, come! Cause she is my wife; come fight me!'"

(e) When plaintiff did not leave the area behind the counter and said, "I don't want a problem, papa," Simon "entered the open door that leads into the small private area behind the counter, said '[Expletive], what's wrong with you? Why you snatch anything out of her hands,' and moved to within inches of Alba's body."

(f) "Simon forcefully pushed Alba against a wall of shelving, Alba's back struck the shelving and he fell into a seat in front of it."

(g) "Alba stayed where he had been pushed, was silent, and averted his gaze."

(h)"Simon stood directly in front of Alba, inches away, and gesticulated and yelled … 'You're gonna say sorry to my daughter.'"

42

(i) Simon had a boxcutter in his right front pocket and "the end of the boxcutter [was] visible."

(j) "Simon grabbed Alba by the back of the collar, lifted him from where he had been thrown, and forcibly moved Alba from the back of the counter area towards its door."

(k) "With Simon holding Alba by the collar and pushing him out of the counter area, Alba reached down for a knife kept on a shelf beside the counter."

(l) "A struggle began as soon as Alba grabbed the knife. As they struggled, Alba repeatedly stabbed Simon."

The above assertions by Bragg also apply to Point I, the lack of probable cause for plaintiff's arrest and prosecution, which is why defendants purposely omitted the information.

In addition to the fabrications and omissions, the Criminal Complaint misleadingly and falsely states Simon was carrying a *small white towel in his left hand and his right hand was empty*; that Simon only pushed the defendant [Alba] *once* and *spoke* to him while the defendant *sat* in a chair; and that Simon put the towel in his pocket and "*attempted to steer*" defendant out of the counter area. These false and misleading statements were designed to downplay Simon's violence.

43

Further, the arraignment judge was not told that Bragg was still investigating to determine whether and what charges to bring and that the Detectives, as set forth in their paperwork, were still investigating. No reasonable person would find that the Criminal Complaint accurately depicted what actually occurred.

To state a denial of a fair trial claim, a plaintiff must establish that an "(1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). "Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Id.* at 278; *see Barnes v. City of N.Y.,* 68 F.4th 123, 129-33 (2d Cir. 2023); *Kee v. City of N.Y.*, 12 F.4th 150, 168-69 (2d Cir. 2021); *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021); *Bermudez v. City of N.Y.*, 790 F.3d 368, 376 n.5 (2d Cir. 2015).

"[A plaintiff] may rely on allegedly false information in the criminal complaint, as well as other documents in the record—such as the … DA's intake form ('data analysis sheet') and arrest paperwork—to bring a claim for a denial of the right to a fair trial." *Kee*, 12 F.4th at 170. "[A]ny information fabricated by an

44

officer can serve as the basis of [the] claim." *Garnett*, 838 F.3d at 279. "The fact that the allegedly fabricated information was incorporated into documents that were not themselves admissible (a criminal complaint and an arrest report) is of no moment." *Long v. Vazquez*, 2016 U.S. Dist. LEXIS 104837, at *13-16 (S.D.N.Y. 2016). This type of claim applies to both police officers and prosecutors, and both "affirmative misrepresentations and misleading omissions" may provide the basis for this claim. *Morse v. Fusto*, 804 F.3d 538, 547-49 (2d Cir. 2015); *see Ashley v. City of N.Y.*, 992 F.3d 128, 139 (2d Cir. 2021).

Moreover, a fair trial claim is available "even if the underlying criminal charges are dismissed and the fabricated evidence is never presented at trial." *Kee*, 12 F.4th at 168. In *Ortiz v. Stambach*, 137 F.4th 48 (2d Cir. 2025), this Court stated that, with respect to claims of both fabrication of evidence and malicious prosecution:

> [T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence. Indeed, [j]uries are frequently (and correctly) instructed, as they were here, that the law makes no distinction between the weight to be given to either direct or circumstantial evidence … Further, inconsistent statements by a defendant can provide a basis for these claims.

*Id.* at 62-63.

Plaintiff's claim that the allegations made against him in the Criminal Complaint, which was based solely on a mischaracterization of a video, and which

45

omitted material facts and was misleading, creates an issue of fact as to falsity. *Jocks*, 316 F.3d at 138; *Kee*, 12 F.4th at 170-71; *Barnes*, 68 F.4th at 129.

Plaintiff sufficiently alleged the store video was falsely described in the Criminal Complaint, in comparison to the accurate description contained in Bragg's motion to dismiss the murder charge, after the public outrage caused Bragg to come clean.[2] In addition, plaintiff was deprived of liberty by being held at Rikers, and by being required to post bail and make court appearances and comply with other restrictions. *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013). In any event, this Court has held that a prosecution, in and of itself, is a deprivation of liberty for purposes of a fair trial claim. *Barnes*, 68 F.4th at 129-133.

Even if defendants had probable cause to charge plaintiff with a crime, this is not a defense to a fair trial claim. *Garnett*, 838 F.3d at 278. However, had plaintiff been charged with a lesser included offense, as indicated in Bragg's Day One Memo, based on the open investigation, he would have been able to post bail and avoid confinement. These other potential lesser crimes can be found in Article 125 of the Penal Law, and are not "A" felonies. Bragg also did not offer plaintiff the benefit of his Day One Memo to defer prosecution while the

---

[2] As shown in the pleadings, this is not the first time that Bragg and his office have falsified a criminal complaint to serve his political agenda. Pursuant to his Day One Memo, a criminal complaint was falsified to charge Christian Hall with a misdemeanor shoplifting charge rather than robbery and use of a weapon. Hall was then released and assaulted a transit worker. (JA259-260).

investigation continued, nor did Bragg decide to not seek bail during this period. Bragg should have also told plaintiff and the arraignment judge that he was still conducting a "criminal investigation" to "guard against prosecution of the innocent" and avoid "premature" assumptions of guilt, and that plaintiff "could see the charges dropped," as Bragg subsequently revealed. As shown in Bragg's Day One Memo, had plaintiff not been a citizen, he could have been charged with a lesser crime to avoid deportation.

Defendants' omissions and failure to turn over the above also amount to a due process violation under *Brady* as this information was exculpatory and impeaching, and the withholding deprived plaintiff of his liberty. *U.S. v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004); *Horn v. Adger*, 2025 U.S. App. LEXIS 14069, at \*5-9 (2d Cir. 2025); *Greene v. City of N.Y.*, 742 Fed. App'x 532, 535 (2d Cir. 2018).

The district court's conclusion that plaintiff's fair trial/due process claim, and independent due process claim based on *Brady,* were insufficiently pled should be rejected. As this Court stated in another case,

> These are more than 'bare assertions ... amount[ing] to nothing more than a formulaic recitation of the elements.' … At this stage, these allegations are sufficient to satisfy the first four elements of a fabricated-evidence claim … Further, before discovery, it is unclear what other facts Barnes could be expected to allege in order to show that Defendants' conduct was knowing, as opposed to mistaken … For these reasons, the district court erred in concluding that Barnes

47

did not plausibly allege that the Defendant Officers knowingly made false statements.

*Barnes*, 68 F.4th at 129-30; *see Ashley*, 992 F.3d at 143 ("The district court erred in charging the jury that '[p]aperwork errors, or mere mistake, or mistakes, by a police officer in making a written record is not a basis for finding a constitutional violation.' … This instruction was severely misleading."); *Barnes*, 68 F.4th at 132 ("[A] prosecutor's decision as to whether to pursue charges may depend on their overall assessment of the case's strength, which in turn may be critically influenced by fabricated evidence, even where other corroborating evidence also exists.").

In conclusion, as in *Carruthers v. Colton*, ___ F.4th ___. 2025 U.S. App. LEXIS 21278 (2d Cir. 2025), this Court should "vacate the district court's dismissal of [plaintiff's] fabrication of evidence claim [and claims based on *Brady*] because the district court improperly weighed the evidence on that claim at the motion to dismiss stage. When the allegations in the complaint are properly construed in the light most favorable to [plaintiff] (including drawing all reasonable inferences in his favor), he has adequately pled a plausible claim of fabrication of evidence." *Id.* at *44.

48

## POINT III

## BRAGG IS NOT ABSOLUTELY IMMUNE

Preliminarily, Bragg was personally involved, as he directly participated in the wrongful acts; helped others commit wrongful acts; failed to remedy a wrong; ratified his subordinates' actions, who acted in accordance with Bragg's instructions, policies and practices; and unlawfully failed to intervene to protect plaintiff. *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023); *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982). Bragg argued that he was not personally involved, while simultaneously contending he was absolutely immune for his acts. The magistrate erroneously concluded in both R&Rs that plaintiff "failed to plead that DA Bragg was 'personally involved' in plaintiff's arrest on Friday night, July 1, 2022 or his arraignment on Saturday, July 2, 2022," and had only sufficiently alleged that Bragg was involved in the dismissal of the criminal charge. (SA44, 59). Although the district court never decided whether Bragg was personally involved (SA135-36), the magistrate and the court denied plaintiff's request that Bragg identify his subordinates who were also involved, and any discovery, such as Bragg's prior statements concerning the prosecution.

Swift public reaction followed the arrest and prosecution of plaintiff, including by the Mayor on July 7-8, 2022, who made public statements in support

49

of plaintiff. "Bragg spokesman Doug Cohen [responded July 7 and/or 8] said …, 'We are continuing to review the evidence and the investigation is ongoing.'" *See also* nypost.com/2022/07/07/nyc-mayor-eric-adams-supports-bodega-worker-jose-alba ("In a statement Wednesday [July 6, 2022], a spokesman for Bragg said 'we are continuing to review the evidence and the investigation is ongoing'").

Undiscovered in prior internet searches, despite a diligent search, Bragg's spokesperson said,

> [Mayor] Adams first made the comments defending Alba twice Thursday, once during an unrelated press conference and again amidst an impromptu stop at the bodega where the incident occurred … In a statement, Bragg's office said *they* requested such high bail because they feared Alba would flee to the Dominican Republic, where many of his family members live. Alba was released after he agreed to surrender his passport, not leave the five boroughs and wear an electronic ankle monitor. Manhattan DA spokesman Douglas Cohen declined to respond directly to the mayor's statements supporting Alba when PoliticsNY reached out for comment, instead only saying, '*we* are continuing to review the evidence and the investigation is ongoing.'[3]

(emphasis added).

Thus, Bragg was personally involved from the beginning, including after plaintiff's arraignment and when plaintiff remained in custody.

---

[3] *See* politicsny.com/2022/07/08/adams-again-defends-bodega-worker-murder-charges-stops-short-criticizing-da-bragg (emphasis added). The Court may take judicial notice of these news articles at the appellate stage. *Jeffery v. City of N.Y.*, 113 F.4th 176, 179 (2d Cir. 2024) (media reports); *Sejin Precision Indus. Co. v. Citibank, N.A.*, 726 F. App'x 27, 31 (2d Cir. 2018) (press coverage).

"The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). "[O]nly qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions." *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004). Because, among other things, Bragg and the Detectives' Reports stated the case was still being investigated after the commencement of the prosecution, Bragg was not an "advocate of a case already assembled," and the "investigative steps [were] taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998).

It is immaterial that Bragg's conduct occurred after the commencement of the prosecution. A prosecutor cannot receive absolute immunity for investigative work merely because the work may later be "retrospectively described" as preparation for a judicial proceeding, such as the grand jury. *Buckley*, 509 U.S. at 275-76. "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." *Burns*, 500 U.S. at 495; *see Zahrey v. Coffey*, 221 F.3d 342, 354 (2d Cir. 2000).

51

A prosecutor's actions in obtaining, reviewing, and evaluating evidence may only be entitled to qualified immunity. "Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court." *Buckley*, 509 U.S. at 276 n.7.

**A. Bragg Did Not Establish he was Absolutely Immune.**

The R&Rs prematurely and erroneously concluded that Bragg was entitled to absolute immunity. "[W]hen it *may not be gleaned from the complaint* whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct *cannot be decided as a matter of law on a motion to dismiss*." *Hill v. City of N.Y.*, 45 F.3d 653, 663 (2d Cir. 1995) (emphasis added).

The second R&R erroneously stated, "[i]n his moving brief ... plaintiff does not so much as mention prosecutorial immunity. He makes no effort to explain why his claims against DA Bragg would not be futile, as instructed by the district judge ... [a]ddressing this issue for the first time in his reply." (SA93). In fact, the SAC explained why Bragg cannot invoke absolute immunity (JA306-306), and in plaintiff's letter to the district judge, dated January 24, 2025, plaintiff noted he

was challenging Bragg's defense of absolute immunity (JA358-59), as he did in response to Bragg's first motion to dismiss.

While plaintiff needed to determine whether Bragg was going to oppose the motion for leave to amend on absolute immunity grounds, and to be apprised of the precise grounds in order to respond with particularity, and neither defendants nor the district court objected, the R&R stated, "[a]rguments made for the first time in a reply brief may be ignored" and that "plaintiff's untimely arguments are recycled from his unsuccessful defense of the FAC, and none of them is rescued by the additional evidentiary detail that now bulks up the proposed SAC." (SA93-94). Aside from erroneously concluding that plaintiff opposed absolute immunity for the first time on reply, the case law cited *supra* shows that Bragg, as the party opposing amendment, bears the burdens of establishing futility and his entitlement to immunity. The R&R then stated,

> As explained in [the first R & R], the allegation that DA Bragg's office continued investigating the Simon homicide after plaintiff was arrested and arraigned does not show that DA Bragg was functioning 'outside his ... role as an advocate for the People[.]' To the contrary: the decision 'whether to present a case to a grand jury' falls squarely within the protection of prosecutorial immunity, as does the 'obtaining, reviewing, and evaluating' of evidence in order to make that decision.

(SA94).

Nothing in the pleadings supports this sweeping conclusion, and the allegations went far beyond what the R&Rs claimed. Bragg has the burden of

53

establishing his entitlement to absolute immunity, *Burns*, 500 U.S. at 496; plaintiff does not have to establish Bragg was acting outside of his advocacy role. Nothing in the pleadings established that Bragg was investigating to prepare for a grand jury presentation. *Galgano v. Cnty. of Putnam*, 2024 U.S. Dist. LEXIS 70460, at *149 (S.D.N.Y. 2024) ("The Second Circuit has distinguished between 'preparing for the presentation of an existing case,' on the one hand, and attempting to 'furnish evidence on which a prosecution could be based,' on the other—making clear that only the former entitles a prosecutor to absolute immunity"). In a footnote, the second R&R also erroneously cited the following cases in support of its conclusion:

> *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (absolute immunity protects prosecutor when "deciding *whether* to bring charges") (emphasis added); *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) ("[I]nvestigative acts reasonably related to decisions *whether or not* to begin or to carry on a particular criminal prosecution ... are shielded by absolute immunity when done by prosecutors.")

(SA94, 32-33). These cases do not establish that Bragg is entitled to absolute immunity. *Simon* speaks to the decision to initiate charges after an arrest, not whether to bring charges *after* filing a misleading Criminal Complaint with material omissions, asking for bail, and deciding whether to charge the accused with anything whatsoever and determining whether he even committed a crime, while the accused is in jail.

54

Further, *Simon* cites *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976), which discussed absolute immunity in "initiating a prosecution," not prosecuting and then searching for probable cause. As for *Giraldo*, in *Simon*, this Court concluded that the prosecutor was conducting investigative work after the prosecution was commenced, which was not covered by absolute immunity. "[A] prosecutor cannot receive absolute immunity for investigative work merely because the work may later be *retrospectively described as preparation* for a judicial proceeding." 727 F.3d at 174 (emphasis added). Here, Bragg charged plaintiff with murder, causing damage to him, and then began an investigation, leaving the Detectives' case open, as the Detectives' Reports show, to determine whether plaintiff even committed a crime. The magistrate further erroneously stated,

> Nor can plaintiff plead around that bar by arguing … that Bragg was 'acting as the administrator of his office,' rather than as a prosecutor, when he 'instituted his racial equity policies and practices,' … , or that racially-motivated prosecutions (including, as plaintiff now puts it, prosecutions rooted in DA Bragg's 'life experiences' as a Black man) are for that reason outside of the prosecutor's 'authority' … For immunity purposes, a district attorney's 'administrative' functions concern matters *other* than prosecutorial policy, such as 'workplace hiring, payroll administration, the maintenance of physical facilities, and the like.' *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009) (holding that DA was absolutely immune from claims that he failed to set up an adequate system to train ADAs and manage impeachment-related information).

(SA35, 95).

55

Contrary to the R &Rs, *Van de Kamp* does not limit administrative functions to "workplace hiring, payroll administration, the maintenance of physical facilities, and the like." The Supreme Court merely listed these as examples. 555 U.S. at 344. Instituting a practice and policy to charge and treat criminal defendants differently for impermissible reasons, not based on their record or criminal conduct, is not the type of policy that, as *Van de Kamp* states, requires "legal knowledge," and *Van de Kamp* states that a prosecutor would not be absolutely immune for "unlawful discrimination in hiring." *Id.* Further*, Van de Kamp* is inapposite as it involved a "system for the Deputy District Attorneys handling criminal cases to access information pertaining to the benefits provided to jailhouse informants and other impeachment information," which is within a prosecutorial function and requires legal knowledge. *Id.* Bragg's Day One Memo does not require legal knowledge and does not involve prosecutorial functions. It is a political document. Discovery is necessary in this case because "[d]rawing a proper line between these functions may present difficult questions[.]" *Id.* at 343.

Further, the magistrate erroneously concluded that plaintiff does not allege that Bragg violated his rights while investigating the case. This misapprehends the claim. Because Bragg was not acting as an advocate when he maliciously prosecuted plaintiff, he is not entitled to absolute immunity for any and all of the misconduct alleged by plaintiff, including allowing plaintiff to remain in custody

56

while he investigated to see whether plaintiff had even committed a crime. Nothing Bragg did fell within the advocacy function.

In another error, citing *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988), the magistrate ruled that the City is not liable for Bragg's conduct because when prosecuting a criminal matter, a district attorney in New York represents the State and not the county. (SA97). The district court only referenced this conclusion with regard to plaintiff's equal protection claim. (SA136). However, in *Bellamy v. City of N.Y.*, 914 F.3d 727 (2d Cir. 2019), this Court explained that "our subsequent cases have narrowed *Baez* in significant and relevant ways" and that the City is liable for the type of misconduct alleged by plaintiff against Bragg and other DANY employees. *Id.* at 757-61.

**B. Bragg was Still Investigating when he Prosecuted Plaintiff.**

When he charged plaintiff with murder, Bragg stated publicly several times that he was still investigating the case. Bragg stated after plaintiff's arraignment that he had "not committed" to prosecuting plaintiff and "[w]e are continuing to review the evidence and the investigation is ongoing." Bragg met with the United Bodegas of America concerning plaintiff's prosecution. On July 12, 2022, the media reported that, in that meeting, Bragg said plaintiff "could see the charges dropped" and "I don't understand why people are jumping to conclusions. I have not made a determination. I am investigating." Moreover,

57

Bragg labeled his actions to be a "criminal investigation" and that he was seeking to obtain facts to determine *whether* to even charge plaintiff. Almost two years later, "a Bragg spokesperson told CNN[,] on April 16 or 17, 2024, 'This matter was resolved nearly two years ago, and the charges were dismissed after a thorough investigation.'" Further, the Detectives' Reports state the investigation was still open after plaintiff was charged and arraigned, and that approximately 30 NYPD officers were on the scene, including the defendant officers, and, on July 5, 2022, the Detectives, still in the investigative stage after plaintiff was arrested and arraigned, reviewed the body-cam videos of the 30 responding officers, and found nothing.

In Bragg's motion to dismiss the murder charge, Bragg stated, "The purpose of this [investigation], as is true of all criminal investigations, was to 'develop sufficient factual information to enable the prosecutor to make a fair and objective determination of whether and what charges should be brought,' to 'guard against prosecution of the innocent,' and to avoid basing a prosecution on 'premature beliefs and conclusions as to guilt or innocence." Bragg added, "[t]he investigation included interviews of civilian witnesses to the stabbing and those who called 911, the police officers and emergency medical technicians who responded to the scene, and the medical examiner. The People visited the crime scene and examined physical evidence. We reviewed medical records. And we

58

analyzed extensive video evidence, including portions not publicly available. The video evidence included surveillance video taken by cameras both inside and outside the Blue Moon." This is what police officers do before making an arrest, although Bragg's motion makes it clear that the decisive factor was the video in defendants' possession from the beginning.

After Bragg charged plaintiff, Bragg and his subordinates did not see a basis for any charges, including manslaughter or criminally negligent homicide, as they moved to dismiss the sole charge of murder and did not amend the Criminal Complaint to add other charges.

"[O]nly qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions," as in the present case. *Bernard*, 356 F.3d at 502; *Buckley*, 509 U.S. at 273. Because Bragg and the Detectives' Reports stated that the case was still being investigated after the commencement of the prosecution, Bragg was not an "advocate of a case already assembled" and the "investigative steps [were] taken to gather evidence." *Smith*, 147 F.3d at 94. It is immaterial that Bragg's conduct occurred after starting the prosecution. *Zahrey,* 221 F.3d at 347 n.2; *Anilao v. Spota*, 774 F. Supp. 2d 457, 477 (E.D.N.Y. 2011).

Even if there was probable cause to arrest plaintiff initially, "a prosecutor's conduct even after probable cause exists might be investigative."

59

*Zahrey,* 221 F.3d at 347 n.2. If it could not be determined from the FAC nor the SAC whether Bragg was still in the investigative phase when he charged plaintiff, this Court cannot grant Bragg absolute immunity. *Warney v. Monroe County*, 587 F.3d 113, 121 (2d Cir. 2009) ("Drawing this line between 'advocacy' and 'investigative' functions is vexed."); *Buckley*, 509 U.S. at 276 n.7.

### C. Bragg was Acting as an Administrator.

"Qualified immunity represents the norm for executive officers … so when a prosecutor functions as an administrator rather than as an officer of the court he is entitled only to qualified immunity." *Buckley*, 509 U.S. at 273. "[G]enerally only (a) the prosecutor's decisions with regard to whether or not to institute a prosecution and (b) his performance of his litigation-related duties are given the shield of absolute immunity … 'Most other activities are characterized as administrative or investigative.'" *Ying Jing Gan v. City of New York*, 996 F.2d 522, 530 (2d Cir. 1993).

Administrative work does not mean acts outside the scope of the duties of a District Attorney and performed by an administrative assistant; it may also mean acts "'directly connected with the conduct of a trial.'" *Seun Ogunkoya v. Monaghan*, 913 F.3d 64, 70 (2d Cir. 2019). However, for absolute immunity to apply, such administrative acts would have to be "intimately associated with the judicial phase of the criminal process" or an "integral part of the judicial process."

60

*Buckley*, 509 U.S. at 276 n.7; *Imbler*, 424 U.S. at 430; *Ying Jing Gan*, 996 F.2d at 528.

When Bragg issued his Day One Memo on his first day in office, he acted as an administrator. This Memo set forth Bragg's political and personal philosophy and which sections of the Penal Law and the Criminal Procedure Law he would follow and which types of crimes Bragg would not prosecute or incarcerate the accused. Bragg's policy resulted in plaintiff being treated in a disparate manner and Bragg did not offer plaintiff the benefit of his policies that would have resulted in plaintiff either not being charged or being released until the investigation was concluded, including deferral of prosecution, restorative justice, charging lesser offenses, not seeking bail, and charging immigrants more leniently to avoid deportation. These acts were not "necessary to the effective functioning of the judicial process" nor "intimately associated with the judicial phase of the criminal process." These were political decisions peculiar and specific to Bragg. (JA326-335).

**D. Plaintiff was Prosecuted before Bragg Acquired Probable Cause.**

Bragg is not entitled to absolute immunity as "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274; *Zahrey,* 221 F.3d at 347 n.2 ("a prosecutor's conduct prior to the establishment of probable cause should be

61

considered investigative"). Based on the arguments in Point I, there was no probable cause to prosecute plaintiff for murder, and Bragg's subsequent statements to the media, and his motion to dismiss, show that Bragg was conducting a "criminal investigation" to obtain facts to determine whether plaintiff even committed a crime. Bragg knew he lacked a legal basis to prosecute plaintiff, as there existed two justification defenses which negated probable cause. After dismissing the murder charge, Bragg did not charge plaintiff with any crime.

**E. Bragg was Engaged in Personal Acts when he Prosecuted Plaintiff.**

Absolute immunity does not apply "when the prosecutor … engages in personal activities totally unrelated to his assigned duties." *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987).

A reasonable prosecutor would not view Bragg's acts of creating and applying his Day One Memo in an unlawful and disparate manner to plaintiff and others, and indicating which laws he would follow, which he would not, and which he would modify, as conduct "reasonably within the functions of a prosecutor, but rather conduct within the functions of a politician. *Giraldo*, 694 F.3d at 166. These acts are set forth in detail in the pleadings, but, because of word limitations, cannot be laid out extensively herein. (JA326-335, 235-237, 241-260, 273-280).

### F. Bragg Acted Without Authority and/or Intertwined his Exercise of Authorized Prosecutorial Discretion with Unauthorized Conduct.

Bragg is not entitled to absolute immunity because "[a] defendant engaged in advocative functions will be denied absolute immunity … if he acts without any colorable claim of authority or has intertwined his exercise of authorized prosecutorial discretion with other unauthorized conduct." *Bernard,* 356 F.3d at 504; *Anilao*, 27 F.4th at 865 n.5. Further, a prosecutor loses absolute immunity if he proceeds in the clear absence of all jurisdiction, meaning there is no statutory authority for the prosecutor's acts. *Byrne v. Vance*, 736 F. App'x 263, 265 (2d Cir. 2018).

Bragg acted outside of his authority and engaged in unauthorized conduct by making it clear during his campaign and in his subsequent statements that he was not going to prosecute certain crimes enacted by the Legislature and the Governor because they conflicted with his personal and political philosophy. (JA326-335, 235-237, 241-260, 273-280).

State law makes it improper for the District Attorney to allow his personal beliefs or agenda to conflict with his duty to prosecute crime *Johnson v. Pataki*, 91 N.Y.2d 214, 223, 226 (1997); *Matter of Abelove v. Cuomo*, 57 Misc. 3d 668, 673 (Sup. Ct. Alb. Co. 2017); Official Misconduct, P.L. § 195.00(2), and he is duty-bound to enforce the law. *See People v. Abelove*, 60 Misc. 3d 595, 602 (Sup. Ct. Renn. Co. 2018), *rev'd on other grounds*, 179 A.D.3d 39 (3d Dept. 2019);

63

*Soares v. State of N.Y.*, 68 Misc. 3d 249, 266 (Sup. Ct. Alb. Co. 2020) ("[A] DA's discretion – even in regard to who may be charged is 'not unfettered" and he cannot proceed "in a manner 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights'").

Even if Bragg has discretion under the law to charge a person with murder, he cannot make these decisions motivated by impermissible reasons. *Anilao*, 27 F.4th at 865 n.5; *Doe v. Phillips*, 81 F.3d 1204, 1211 (2d Cir. 1996) (charging decision violated First Amendment).

**POINT IV**

**THE NYPD DEFENDANTS ARE NOT ENTITLED
TO QUALIFIED IMMUNITY**

The Detectives and police officers sought qualified immunity under federal law regarding the issue of probable cause and focused only on plaintiff's justification defense to use deadly force in defense of his person. Defendants made no argument that they were immune as to plaintiff's justification defense for stopping a burglary. Also, defendants did not raise any state law immunity defense.

Plaintiff also asserts an unlawful seizure claim against the City defendants under N.Y.C. Admin. Code §§ 8–802-807, for which no legal immunity is available, § 8-804. In the R&Rs, the magistrate stated, "plaintiff cannot avoid the

bar of prosecutorial immunity by suing DA Bragg under the New York City Administrative Code" because Bragg is not a "covered individual" under § 8-801. (SA30, 93).

Plaintiff never claimed that Bragg was covered under this statute, but the magistrate did not mention that qualified immunity is not available to the Detectives and officers under this law. Thus, this Court need only determine whether defendants have met their burden of demonstrating they are entitled to qualified immunity under federal law, and only as to the issue of probable cause on plaintiff's claim of self-defense. The second R&R, like defendants' opposition to plaintiff's motion to amend, did not discuss that plaintiff was entitled to use deadly force to prevent or terminate a burglary under P.L. § 35.20(3).

Contrary to the R&Rs (SA119-20), "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Eaton v. Estabrook*, 144 F.4th 80, 93 (2d Cir. 2025). The magistrate, citing *Frederick v. Boyd*, 2021 U.S. Dist. LEXIS 120301, at *9 (E.D.N.Y. 2021), stated that, in determining whether plaintiff's conduct gives rise to a state crime, federal courts must turn to state law. However, *Frederick* cites no cases in support of this proposition, except *Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005), which did not concern

65

qualified immunity, but rather whether a federal court sitting in diversity should adopt innovative theories that may distort established state law.

In any event, this Court should reject the magistrate's conclusion that defendants are entitled to qualified immunity because "the extent to which a defendant may assert a successful justification defense after using deadly force on a single, unarmed assailant is not clearly established" under state law. (SA56-58, 119-20). Neither P.L. § 35.15(2) nor case law states that one cannot use deadly force against an unarmed individual. *People v. Morgan*, 99 A.D.3d 622, 622-23 (1st Dept. 2012); *In re Y.K.*, 87 N.Y.2d 430, 434 (1996). Such a reading would bar the use of deadly force against an individual who was strangling or trying to drown the victim because the attacker was unarmed. In any event, Bragg's motion to dismiss the murder charge stated that Simon had a box cutter visible in his front pocket. And again, the magistrate did not analyze P.L. § 35.20(3), which was raised in the SAC.

Finally, this Court "has made clear that a defendant seeking to assert the affirmative defense of qualified immunity must adequately develop that defense," *Horn*, 2025 U.S. App. LEXIS 14069, at *8, and where, as here, "there is a material question of fact as to the relevant surrounding circumstances, the question of objective reasonableness [for purposes of determining qualified

66

immunity] is a question for the jury." *Green v. City of N.Y.*, 465 F.3d 65, 83 (2d Cir. 2006).

## POINT V

**PLAINTIFF HAS PLAUSIBLY ALLEGED EACH DEFENDANT'S PERSONAL INVOLVEMENT, FAILURES TO INTERVENE AND THE PLEADINGS DO NOT CONTAIN IMPROPER GROUP PLEADING**

A law enforcement officer must intercede when his fellow officers are violating a citizen's constitutional rights. *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). The question of whether an officer had a reasonable opportunity to intervene is an issue of fact for the jury. *Figueroa v. Mazza*, 825 F.3d 89, 107-08 (2d Cir. 2016). Those defendants employed by Bragg and the NYPD whom discovery reveals did not directly participate in the violations, are liable for failing to intervene, as these defendants, identified and unidentified, were present for the violations, were aware of what was occurring, and had a reasonable opportunity to intervene, but did not fulfill their constitutional duty. They knew that the information conveyed by the defendants in the Criminal Complaint was false, misleading and omitted vital facts, that there were no witnesses inculpating plaintiff, and that Lee did not see what took place behind the store counter and was incredible. Those defendants who did not directly participate could have, among other things, reported the Detectives, officers and personally involved

67

prosecutors and DANY employees to their superiors, government watchdog agencies, the criminal court judge, and the press, especially when the case immediately became public.

Contrary to the orders below, because a failure to intervene and assisting another defendant violate a plaintiff's personal rights are sufficient to show personal involvement, *Provost,* 262 F.3d at 155 ("helping others to do the unlawful acts"), all defendants, including those unidentified, were involved in the arrest, prosecution, and other violations in this case. Thus, the orders below are incorrect that only Detective Garcia was involved as only he signed the Criminal Complaint and is mentioned in the Detectives' Reports as (using NYPD parlance) the "arresting officer." (SA44, 49, 59, 63-66).

Where, as here, a plaintiff sufficiently alleges a constitutional violation, he is entitled to discovery to determine who directly participated and who failed to intervene. *See e.g. Buari v. City of N.Y.,* 530 F. Supp. 3d 356, 393 (S.D.N.Y. 2021) (collecting cases). The district court erred in dismissing these claims as plaintiff stated a claim and was entitled to discovery to determine whether a defendant directly participated or failed to intervene.

Further, contrary to the orders below, the allegations in plaintiff's pleadings state a failure to intervene claim, and plaintiff's claims do not amount to improper group pleading as defendants acted collectively. Discovery will refine each

68

defendant's specific acts. *Serrata v. Givens*, 2019 U.S. Dist. LEXIS 64277, at *13-14 (E.D.N.Y. 2019) (rejecting group pleading argument where the complaint refers to all the defendants collectively).

## POINT VI

**THE CITY, COMMISSIONER MOLINA AND UNIDENTIFIED DEFENDANTS ARE LIABLE FOR THE UNCONSTUTIONAL CONDITIONS OF CONFINEMENT AND INADEQUATE MEDICAL CARE PLAINTIFF EXPERIENCED AT RIKERS ISLAND**

Plaintiff asserts federal and state claims against the City, Commissioner Molina, and other unidentified DOC officials in charge of the Rikers intake area, and who were responsible for ensuring that plaintiff received medical care. Molina never argued that he was not personally involved, but the R&R, dated July 18, 2025, raised it as a purported pleading defect. (SA130-131). The City and Molina instead argued that plaintiff insufficiently alleged an increased risk from Covid-19 without any "further specificity or tangible harm" and that he alleged nothing more than negligence. As for plaintiff's medical indifference claim, the City and Molina argued only that plaintiff's stab wounds were not serious, and the lack of medical care did not cause injury. Neither defendants nor the R&R addressed the substance of the negligence claim.

First, plaintiff has pled a viable claim based on the unlawful conditions of his confinement in the Rikers intake area, including exposing him to Covid-19 and

69

other infectious diseases, and a failure to provide medical care. The R&R mischaracterized and ignored these allegations and was incorrect on the law. In addition to the photos in the pleadings, the citation for the photos shows similar photos of the abysmal conditions in the intake area. Plaintiff was in an "overcrowded," intake cell, similar to the horrible cell in the photos cited in the SAC, for approximately two days in violation of DOC policy and City law. Further, it has been reported that many detainees were kept in DOC intake cells beyond the period permitted by City law and that DOC employees falsified records regarding these time periods. Molina and other unidentified DOC officials knew this was taking place through observations and from subordinates and reports. In July 2023, the former U.S. Attorney for the Southern District "said in a statement the feds can no longer wait for 'substantial progress' to be made on Rikers, and his office would seek a powerful court-appointed receiver to address the horrid conditions." Bragg was also aware of the horrid conditions at Rikers when plaintiff was arrested, describing Rikers as a "humanitarian crisis" and an "ongoing crisis."

Placing a senior citizen with stab wounds in the filthy, overcrowded environment depicted in the photos for two days without protection from contracting Covid-19 presented a substantial risk of harm. The second R&R claimed plaintiff's conditions of confinement claim fails because he does not

70

allege he contracted Covid-19 or any other disease. This is not the law; a plaintiff need only establish a *risk* of substantial harm. *Darnell v. Pineiro*, 849 F.3d 17, 23-26, 30 (2d Cir. 2017); *Fed. Defs. of New York Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020) ("grave and enduring" risk posed by COVID in the correctional context); *Gil-Cabrera v. Dep't of Corr.*, 2021 U.S. Dist. LEXIS 221479, at *10 (S.D.N.Y. 2021) ("[C]ourts have found that an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus").

Further, a serious injury is not a necessary element of a conditions claim. *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015). In addition to exposing plaintiff to Covid-19 and other diseases, the overcrowded conditions shown in the cell, without beds and other necessities, as depicted, violated the Fourteenth Amendment. *Darnell*, 849 F.3d at 23-26, 30. Again, Molina and other unidentified DOC officials were aware that this was taking place through observations and from subordinates and reports.

The R&R's conclusion that plaintiff did not sufficiently allege Molina's personal involvement was erroneous. (SA55).[4] Plaintiff alleges that Molina and the unidentified defendants were aware of these conditions, having seen the intake area and heard about it from subordinates, reports, the media and lawsuits, which

---

[4] In the first R &R, the magistrate erroneously stated that plaintiff withdrew his claims against Molina. (SA67).

71

is sufficient to place him on notice or to impute knowledge. *Perez v. Molina*, 2023 U.S. Dist. LEXIS 106850, at *13 (S.D.N.Y. 2023). Plaintiff's pleadings make clear that Molina was not named simply because he was the head of the DOC. *Provost*, 262 F.3d at 155 (collecting cases); *Gatson v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) (alleging prison guards "made daily rounds" sufficient to allege that defendants had actual knowledge of inhumane conditions); *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013) (informing defendants about jail conditions and alleging defendants witnessed the conditions sufficient to satisfy deliberate indifference element).

Second, plaintiff has sufficiently stated federal and state claims regarding the lack of medical care he received. Where a plaintiff alleges he was deprived of medical care in a jail, he must demonstrate he was "actually deprived of adequate medical care," and that the "inadequacy in medical care [was] sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006). The "seriousness" of the medical condition is one factor in this inquiry, but it is not the only one. *Id.* at 280.

For example, "if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious ... [but] if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption

72

in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id.*

Plaintiff has sufficiently alleged his claim. Hours after his arrival at Rikers, plaintiff was taken to a Rikers clinic where it was determined his stab wounds needed to be cleaned twice daily and he needed medication to prevent or cure an infection and alleviate pain. Despite his numerous requests, unidentified correction officers and medical staff did not ensure that plaintiff received treatment and medication. Officers only took plaintiff for follow-up care one time during his incarceration. Plaintiff is unaware of the names of these DOC employees, but Molina and other DOC officials knew about the unlawful level of care, having seen and heard about it from subordinates, reports, the media and other lawsuits. As the pleadings state, the DOC has been held in contempt in Supreme Court, Bronx County, for systemically not taking inmates for medical care. *Edwards v. City of N.Y.*, 2015 U.S. Dist. LEXIS 114039, at *16 (S.D.N.Y. 2015) (government reports, news articles and prior lawsuits plausibly show policymakers were on notice).

Plaintiff need not establish a serious injury; the Court can take judicial notice that an infection can lead to substantial pain and other complications, especially to a senior citizen. "A serious medical condition exists where the failure

73

to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000).

## POINT VII

## PLAINTIFF'S STATE LAW CLAIMS SHOULD BE REINSTATED

The City is vicariously liable for the individual defendants' violations of plaintiff's rights under state and city law because the individual defendants were acting within the scope of their employment. *Triolo*, 24 F.4th at 110. Further, because plaintiff's claims involved a seizure and search of his person, the actions of the defendant Detectives and officers amount to an actionable unreasonable search and seizure under N.Y.C. Admin. Code §§ 8–802 and 803(d). Moreover, if Bragg is absolutely immune, and the other defendants are qualifiedly immune under federal law for their unlawful acts, the City remains vicariously liable under state law. *Triolo*, 24 F.4th at 110-13.

Plaintiff's assault and battery claims should be sustained as he was unlawfully touched following a false arrest, and subjected to a nonconsensual and offensive touching by being handcuffed and searched. *Graham v. City of New York*, 128 F. Supp. 3d 681, 712 n.17 (E.D.N.Y. 2015); *Griffin v. City of N.Y.*, 67 A.D.3d 550, 550-51 (1st Dept. 2009).

74

Plaintiff's negligence claim arising from the conditions of his confinement and deprivation of medical care should also be reinstated. *Sanchez v State of New York*, 99 N.Y.2d 247, 252-255 (2002) (having assumed physical custody of inmates, the government owes a duty of care to protect inmates from risks of harm in custody that the government was on actual or constructive notice).

## POINT VIII

### THE DENIAL OF DISCOVERY DEPRIVED PLAINTIFF OF HIS SUBSTANTIAL RIGHTS

The magistrate denied plaintiff discovery from the inception of this case, including initial disclosures, preventing plaintiff from adding unidentified personally involved individuals as defendants. In addition to his formal motion for discovery contained in his motion to amend, plaintiff wrote letters to both the magistrate and the district judge requesting discovery. (JA336-357). This was particularly prejudicial as the district court dismissed the claims against Commissioner Molina, Bragg, and other Detectives and officers, erroneously concluding they were not personally involved. Bragg also simultaneously moved to dismiss plaintiff's claims against unidentified DANY defendants, who had never appeared. Defendants never moved to stay discovery but merely responded to plaintiff's numerous requests for discovery in a conclusory manner that discovery was premature and plaintiff lacked good cause. Further, defendants were permitted to submit evidence outside the pleadings, which plaintiff was not

75

permitted to explore through discovery. Plaintiff pointed this out to the district court, which ruled in the final order that plaintiff had failed to state a claim. This erroneous dismissal, without granting plaintiff an opportunity for discovery, depriving plaintiff of his substantial rights, requires vacatur. *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795 (2d Cir. 1985); *Davis v. Kelly*, 160 F.3d 917, 921-22 (2d Cir. 1998).

## CONCLUSION

This Court should vacate the orders appealed from.

Dated: October 14, 2025

*/s/ Richard Cardinale*

_____

RICHARD CARDINALE
Attorney at Law
26 Court Street, Suite # 1504
Brooklyn, New York 11242
(718) 624-9391
richardjcardinale@pm.me

Stephen Bergstein
Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277
steve@tbulaw.com

76

## CERTIFICATION

Richard Cardinale counsel for Plaintiff-Appellant, affirms that this brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The font is 14 point. The brief contains 15,575 words. This Court has granted Plaintiff-Appellant leave to file an oversized brief no more than 16,500 words.

*/s/ Richard Cardinale*
Richard Cardinale

77